Dan **BUCKLEY**, Plaintiff–Appellant,

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.**, Defendant–Appellee.

**Docket No. 96–9039**

United States Court of Appeals, Second Circuit.

Argued June 10, 1998.

Decided Sept. 11, 1998.

Robert David Goodstein, New Rochelle, NY (Goodstein & West, Eileen West, Helena H. Epstein, New Rochelle, NY, on the brief), for Plaintiff–Appellant.

Barbara Carey, New York City (Mary K. Schuette, Carole Sobin, New York City, on the brief), for Defendant–Appellee.

Before: WINTER, Chief Judge, and KEARSE, WALKER, JACOBS, LEVAL, CALABRESI, CABRANES, PARKER, and POOLER, Circuit Judges.

Judge CALABRESI concurs in a separate opinion.

KEARSE, Circuit Judge:

Plaintiff Dan Buckley appealed from a final judgment of the United States District Court for the Southern District of New York, Barrington D. Parker, Jr., *Judge,* dismissing his amended complaint which alleged that defendant Consolidated Edison Company of New York, Inc. ("Con Edison" or the "company"), violated his rights under the Americans with Disabilities Act of 1990 ("ADA" or the "Act"), 42 U.S.C. §§ 12101–12213 (1994), and the New York State Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1993 & Supp.1998), in terminating his employment because he was unable to provide a urine sample for a company-administered drug test due to a neurogenic bladder condition, a condition not regarded as a disability under the ADA. The district court dismissed the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), ruling that Buckley had failed to state a claim on which relief can be granted under the ADA, and declining to exercise supplemental jurisdiction over his state-law claims. *See Buckley v. Consolidated Edison Co.,* 934 F.Supp. 104 (1996) *("Buckley I ").* On appeal, a divided panel of this Court reversed, holding that, in suggesting that Con Edison had available an alternative means of drug testing that would have accommodated the neurogenic bladder condition, the amended complaint stated a claim on which relief can be granted under the ADA. *See Buckley v. Consolidated Edison Co.,* 127 F.3d 270 (1997) *("Buckley II ").* On *en banc* reconsideration, we conclude that an employer's administration of generally accepted substance-abuse urine tests for the illegal use of drugs, pursuant to 42 U.S.C. § § 12114(b), to employees identified as recovering substance abusers more frequently than to other employees, without making accommodation for neurogenic bladders, a condition not alleged to be or to result from an ADA-covered disability, does not violate the ADA. We therefore vacate the decision of the panel and affirm the judgment of the district court dismissing the amended complaint.

## I. BACKGROUND

Buckley was employed by Con Edison from February 1976 until the company terminated his employment in July 1994. He commenced the present action in 1995. As amended, the complaint, whose allegations are taken as true for purposes of reviewing the Rule 12(b)(6) dismissal, described the following events.

### A. The Amended Complaint and the Decision of the District Court

Con Edison ordinarily subjects its employees who have not been identified as former alcohol or substance abusers to random drug/alcohol testing approximately once every five years. In 1991, Buckley was identified as an alcohol/substance abuser, and he underwent treatment at a residential facility.

In 1993, he suffered a relapse and received additional treatment. As a result of his identification as an alcohol/substance abuser, Con Edison required Buckley to submit to random drug/alcohol testing approximately once every 25 days.

For that testing, Buckley "was required to provide a urine specimen under observation and, on occasion, to strip naked to provide said urine specimen." (Amended Complaint ¶ 6.) Buckley suffers from a "medical condition known as neurogenic bladder, which is not a disability pursuant to the statutory definition contained within the Americans with Disabilities Act" (*id.* ¶ 2), which causes "an inability to urinate, particularly in public or on command" (*id.* ¶ 11). On June 24, 1994, Buckley was ordered to report to Con Edison's medical facility for a drug test. Although he provided a blood sample, he was "unable to produce a urine specimen in the time allotted to him." (*Id.* ¶ 12.) His request for additional time to provide a urine sample was denied. Thereafter, Buckley went on his own to a hospital, paid to have a urine sample taken, and had the results forwarded to Con Edison. Nonetheless, on July 1, 1994, his employment "was terminated because he was unable to urinate on command and supply a sample to defendant's drug testing doctor" (*id.* ¶ 7).

Buckley commenced the present action, asserting claims under the ADA and the New York Human Rights Law. Following a challenge by Con Edison to the sufficiency of the original complaint, Buckley filed the amended complaint that is the subject of this appeal. The amended complaint, although emphasizing that Buckley's neurogenic bladder condition "is *not* claimed as a disability pursuant to the Americans with Disabilities Act" (*id.* ¶ 11 (emphasis in original)), alleged that Con Edison discriminated against Buckley because of his disability through (a) its administration of a test that was "not 'reasonable'" within the meaning of 42 U.S.C. § 12114(b) (*id.* ¶ 7; *see also id.* ¶¶ 13, 18, 19), and (b) its "failure ... to reasonably accommodate him by extending the time allowed for him to urinate" (*id.* ¶ 10; *see also id.* ¶ 16).

Con Edison moved to dismiss the amended complaint on the principal ground that it failed to state a claim under the ADA. In *Buckley I*, the district court granted the motion, stating in part as follows:

> In his amended complaint, Buckley has not alleged that Con Edison's drug testing procedures unreasonably failed to accommodate his disability as an alcohol/substance abuser. Rather, he continues to allege that, in requiring a urine sample within a specified period of time, Con Edison's procedures unreasonably failed to accommodate his bladder condition. Because Buckley concedes that his bladder condition is not a disability under the ADA, however, Con Edison's failure to accommodate it cannot constitute a violation of the ADA.

934 F.Supp. at 106. Having determined that Buckley's federal claims must be dismissed, the district court declined to exercise supplemental jurisdiction over his state law claim. Judgment was entered dismissing the complaint, and Buckley appealed.

### B. *The Panel Decision*

In *Buckley II*, a divided panel vacated the judgment, ruling that the amended complaint stated a valid claim under the ADA. Noting that Con Edison subjects recovering substance abusers such as Buckley to testing about once a month but subjects employees who are not former substance abusers to testing only about once every five years, the panel majority concluded that the amended complaint stated a valid claim under the ADA because it alleged that, under Con Edison's policy, recovering addicts are tested more frequently than nonaddicts and hence likely to be fired sooner than nonaddicts:

> Con Edison's policy *treats those employees* who have neurogenic bladders and *who are recovering drug addicts differently from those employees* who have neurogenic bladders and *who are not recovering drug addicts*. Recovering addicts are, appropriately, required to take a drug test approximately once a month, while employees without a record of addiction are only tested, on average, once every five years. Given the test that Con Edison uses, the neurogenic bladder *employees who are re-*

*covering addicts will be fired after one month,* regardless of drug use. The neurogenic bladder *employees who are not recovering addicts will also be fired* regardless of drug use, *but only after an average of five years.* This differential treatment discriminates on the basis of an ADA-covered disability (being a recovering addict) and therefore constitutes a prima facie violation of the ADA if a reasonable accommodation for the "known physical or mental limitations of an otherwise qualified individual with a disability" is available.

*Buckley II,* 127 F.3d at 274–75 (footnote omitted) (emphasis added). The panel majority concluded that "a reasonable accommodation" was available,

> focus[ing] not on Buckley's ADA-covered disability (being a recovering addict) but on his bladder condition. Employees with neurogenic bladders who are recovering addicts can be accommodated either by allowing them more time to urinate or by permitting them to submit blood rather than urine samples. In evaluating the reasonableness of this accommodation, it is important to note that Buckley is subject to dismissal some five years earlier than others who suffer from the same bladder condition only because of his ADA-covered disability (being a recovering addict). For it is this disability that makes frequent public urination on command a condition of his employment. As a result, although the remedy might seem to respond to his bladder condition, what is truly being accommodated is Buckley's disability that derives from his status as a recovering addict. It follows that Con Edison's refusal to make this type of accommodation is a violation of the ADA.

*Id.* at 275.

The dissent disagreed, noting that the Act expressly permits drug testing of former substance abusers and does not state that others must also be tested, and therefore logically permits testing of former substance abusers more frequently than non-former-abusers. The dissent pointed out that the majority opinion, although stating this principle, failed to apply it: the majority's conclusion that a recovering substance abuser with a neurogenic bladder condition is the victim of ADA-prohibited discrimination because he will be fired after one month, whereas the otherwise similarly situated nonabuser with a neurogenic bladder condition will be fired after five years, was based solely on the concededly legitimate process of testing the recovering addict more often. The dissent also concluded that the panel majority's ruling that an employer could be held to violate the Act by refusing to allow additional time for completion of the test by employees afflicted with neurogenic bladders inappropriately constituted a requirement that employers accommodate neurogenic bladders, a condition that is not a disability within the meaning of the Act. *See Buckley II,* 127 F.3d at 275–77 (dissenting opinion).

### C. *The Petition for Rehearing* En Banc

Con Edison petitioned for rehearing, with a suggestion for rehearing *en banc,* arguing principally that *Buckley II* misapprehended the requirement that a claimant under the Act plead discrimination "because of his disability" and failed to give effect to the ADA's provision that more frequent testing of former substance abusers is not a violation of the Act. In February 1998, we agreed to rehear the appeal *en banc.* For the reasons that follow, we vacate the panel decision and affirm the district court's dismissal of the amended complaint for failure to state a claim on which relief can be granted under the ADA.

### II. DISCUSSION

Buckley's amended complaint may be viewed as asserting that Con Edison violated the ADA in three respects: (1) by testing for drugs by means of urine tests, (2) by testing former substance abusers more frequently than those not identified as former abusers, and (3) by failing to accommodate Buckley's neurogenic bladder condition. We conclude that none of these assertions stated a claim on which relief can be granted under the ADA.

### A. *The Anti–Discrimination Provisions of the ADA*

The ADA provides that "[n]o [employer covered by the Act] shall discriminate

against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The principal statutory terms on which we focus for purposes of the present case are "disability," "qualified individual with a disability," and "discriminate."

The Act defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," *id.* § 12102(2)(A), or "a record of such an impairment," *id.* § 12102(2)(B), or "being regarded as having such an impairment," *id.* § 12102(2)(C). Regulations promulgated under the Act define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1997). Guidelines promulgated under the ADA by the Equal Employment Opportunity Commission ("EEOC Guidelines") indicate that this list is "not exhaustive" and is meant to include "sitting, standing, lifting, [and] reaching," as well as "those basic activities that the average person in the general population can perform with little or no difficulty." EEOC Guidelines, 29 C.F.R. pt. 1630, App. § 1630.2(i), at 350 (1997). Buckley's amended complaint conceded that his neurogenic bladder condition, disabling him from urinating in public or on command, does not limit him in a major life activity, and disclaimed any contention that that condition is a disability within the meaning of the Act.

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). This definition is itself qualified by two provisions focusing on individuals who are or have been substance abusers. First, the Act provides that the term "qualified individual with a disability" does "not include any employee ... who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." *Id.* § 12114(a). Second, it provides that "[n]othing in [the § 12114(a) exclusion] shall be construed to exclude as a qualified individual with a disability an individual who ... has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use." *Id.* § 12114(b)(1).

The term "discriminate," as used in the Act, includes "utilizing standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability." *Id.* § 12112(b)(3)(A). As discussed in greater detail in Part II.C. below, the Act also provides that discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

### B. *The Use and Frequency of Drug Tests*

■ Notwithstanding its provision that an individual who has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs may be considered a qualified individual with a disability, 42 U.S.C. § 12114(a), the ADA provides that the reasonable testing of such an individual for the illegal use of drugs is not discrimination within the meaning of the Act:

> it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that [a former substance abuser] is no longer engaging in the illegal use of drugs.

*Id.* § 12114(b). According to the legislative history, this section was intended to

> permit[ ] employers to conduct drug tests or take reasonable actions to ensure that an individual is no longer using illegal drugs. This provision grants employers the ... right .... to conduct drug tests on applicants and employees without violating this Act, but does not require[ ] such testing. An employer may use other means to ensure that a person is no longer using

drugs as long as those measures are reasonable.

Report of the House of Representatives Committee on Education and Labor, H.R.Rep. No. 101–485(II), at 77–78 (1990) ("House Report" or "Report"), *reprinted in* 1990 U.S.C.C.A.N. 303, 360.

As to permissible testing methods, the Act is silent, but the House Report stated that

[t]he Committee believes that test results should be accurate and encourages covered entities to follow the Mandatory Guidelines on Federal Workplace Testing as issued by the Department of Health and Human Services.

*Id.* at 79, *reprinted in* 1990 U.S.C.C.A.N. at 362. The Department of Health and Human Services Mandatory Guidelines on Federal Workplace Testing Programs ("HHS Testing Guidelines"), 53 Fed.Reg. 11,970 (1988), referred to in the House Report, dealt solely with urine tests. As promulgated in 1988, they established standards with respect to urine drug tests for use by federal agencies, including the Department of Defense and other groups having large-volume drug-testing programs. The HHS Testing Guidelines set "[p]recise requirements for quality assurance and performance testing specific to urine assays for the presence of illegal drugs," *id.* at 11,970, taking into consideration such factors as "[t]he need to assure the protection of individual rights within the context of a drug testing program—linked to both employee assistance programs and the management potential for taking adverse action against an employee," *id.*, the need of the employer to ensure that its employees are not using illegal drugs, *id.* at 11,973, and the "state of the art in drug detection," *id.* As revised in 1994, *see* 59 Fed.Reg. 29,908 (1994), the HHS Testing Guidelines still deal only with urine tests.

In light of the statutory provisions and the legislative history, Buckley's challenges to (a) the use and (b) the frequency of Con Edison's urine testing procedures must be rejected.

■ As to use, several paragraphs of the amended complaint asserted that the drug test administered by Con Edison was "not 'reasonable'" within the meaning of § 12114(b). (Amended Complaint ¶¶ 7, 19; *see also id.* ¶ 18). However, there were no factual allegations to indicate why the test itself should be considered unreasonable. There was no suggestion that Buckley was not subjected to the same urine test that was administered to all tested employees, or that tests other than standard tests as envisioned by the ADA were administered. The bald assertions that the test was unreasonable were insufficient to state a claim. Given that Congress "encourage[d]" employers to follow guidelines that deal solely with urine tests, we think it plain that in Congress's view standardized urine tests are in the category of tests that are reasonable.

■ The only suggestion in the amended complaint that Buckley was treated differently from Con Edison employees who were not former substance abusers comes from the allegations dealing with the frequency of testing, *i.e.*, that Buckley was randomly tested once every 25 days and non-former-abusers were tested only once every five years. We think it clear, however, that the more frequent testing of employees who have been identified as former substance abusers is not prohibited. As indicated above, the Act provides that "drug testing, designed to ensure that [a former substance abuser] is no longer engaging in the illegal use of drugs," "shall not be a violation of [the Act]." 42 U.S.C. § 12114(b). And unlike other provisions of the Act governing certain other types of examinations, § 12114 does not provide that an employer cannot test former substance abusers for the illegal use of drugs without also testing those who have not been so identified. For example, the giving of an employment entrance medical examination may constitute discrimination within the meaning of the Act, *see* 42 U.S.C. § 12112(d)(1) ("the prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations"), unless all employees within the job category are subjected to such an examination, *see id.* § 12112(d)(3)(A); *see also* House Report at 73, *reprinted in* 1990 U.S.S.C.A.N. at 355 (the "legislation allows covered entities to require medical examinations after a con-

ditional job offer has been made, so long as [*inter alia*] they are given to all entering employees in a particular category"). In permitting drug tests, however, § 12114 imposes no such condition of overall testing. Indeed, it specifies that "[f]or purposes of this subchapter, a test to determine the illegal use of drugs *shall not* be considered a medical examination," *id.* § 12114(d)(1) (emphasis added), thereby confirming that an employer who undertakes to test employees identified as former substance abusers for the illegal use of drugs is not required to administer such tests also to employees not so identified.

Given the provisions of § 12114 indicating that an employer may lawfully test former substance abusers for the illegal use of drugs without testing other employees at all, we conclude that an employer does not discriminate in violation of the ADA by administering tests for the illegal use of drugs to former substance abusers more frequently than it administers such tests to those not identified as former substance abusers. To the extent, therefore, that the amended complaint was intended to assert that Con Edison violated the ADA by requiring Buckley to undergo such testing with greater frequency than employees who were not former abusers, it failed to state a claim under the Act.

### C. *The Duty To Make Reasonable Accommodations*

The Act also provides that, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A). We note preliminarily that although several paragraphs of the amended complaint stated that Con Edison had failed to accommodate Buckley's "disability" (¶¶ 13, 14, 16), those assertions—insofar as they were meant to refer to the only condition here claimed as a disability within the meaning of the ADA, *i.e.*, his condition as a recovering substance abuser—were entirely conclusory. No facts were pleaded to indicate that Buckley required

accommodation in relation to his former substance abuse. Indeed, any such thought was contradicted by the amended complaint, which alleged that as to that condition, at the time of his termination, Buckley "was fully able to reasonably perform the duties of his job" (*id.* ¶ 14).

Rather, Buckley's accommodation claim was that Con Edison's "failure ... to reasonably accommodate him *by extending the time allowed for him to urinate,* [was] a violation of § 12114 and of the duty of reasonable accommodation as included in 42 U.S.C. § 12112." (Amended Complaint ¶ 10 (emphasis added); *see also id.* ¶ 12 ("he was denied" a "reasonable accommodation in order to produce his urine specimen")). There being no suggestion that Buckley's inability to produce a urine sample under time constraints or under supervision was related to his recovering-substance-abuser status, this too fails to state a claim under the ADA, for what the ADA forbids is discrimination "because of the disability of" the qualified individual, 42 U.S.C. § 12112(a), and discrimination "on the basis of disability," *id.* § 12112(b)(3)(A). It does not govern discrimination on other bases. Thus, the language of the Act, in defining discrimination to include the failure to make reasonable accommodation for an otherwise qualified employee's known disability, does not require an employer to make accommodation for an impairment that is not a disability within the meaning of the Act or that does not result from such a disability. *See, e.g., Borkowski v. Valley Central School District*, 63 F.3d 131, 143 (2d Cir.1995) (discharge is "because of" plaintiff's disabilities within meaning of ADA if, *inter alia*, failure to provide reasonable accommodation leads to "discharge for performance inadequacies *resulting from the disabilities* " (emphasis added)).

The legislative history similarly reveals that the condition to be accommodated is the condition that constitutes the disability: "The term 'otherwise qualified' is used in this particular provision [§ 12112(b)(5)(A) ] in order to clearly describe a person with a disability who meets all of an employer's job-related selection criteria except those criteria that he or she cannot meet *because of a disability,*

but which could be met with a reasonable accommodation." House Report at 64, *reprinted in* 1990 U.S.C.C.A.N. at 347 (emphasis added). Thus, the House Report notes that the first step in determining reasonable accommodation is "identif[ying] the barriers to job performance *caused by the disability." Id.* at 66, *reprinted in* 1990 U.S.C.C.A.N. at 348 (emphasis added).

Consistent with the language of the Act and with this legislative history, the EEOC regulations interpreting the Act note that "[e]mployers are obligated to make reasonable accommodation *only* to the physical or mental limitations *resulting from the disability* of a qualified individual with a disability that is known to the employer," EEOC Guidelines, 29 C.F.R. pt. 1630, App. § 1630.9, at 362 (emphasis added). Accordingly, the regulations and the EEOC Guidelines instruct employers to make accommodations for the disability or for limitations resulting from the disability, not for other unrelated conditions. *See, e.g.,* 29 C.F.R. § 1630.2(*o*)(3) (employer "should identify the precise limitations *resulting from the disability* and potential reasonable accommodations that could overcome *those limitations*" (emphasis added)); EEOC Guidelines, 29 C.F.R. pt. 1630, App. § 1630.9, at 362 (employer "should ... ascertain the precise job-related limitations *imposed by the individual's disability* and how *those* limitations could be overcome with a reasonable accommodation" (emphasis added)).

■ Since a neurogenic bladder condition neither is nor results from the only impairment here alleged to be a disability within the meaning of the ADA, and since it is the neurogenic bladder condition that Con Edison refused to accommodate and that led to the termination of Buckley's employment, we conclude that Buckley has not stated a claim under the Act.

## CONCLUSION

We have considered all of Buckley's arguments on this appeal in support of his claims under the ADA and have found them to be without merit. We note that the district court, after dismissing Buckley's federal claims, properly declined to exercise supplemental jurisdiction over his claim under the New York State Human Rights Law. Accordingly, the judgment here does not foreclose Buckley's pursuit of that state-law claim in state court.

The decision of the panel is vacated; the judgment dismissing the complaint is affirmed.

CALABRESI, Circuit Judge, concurring:

When this case was first appealed, I was troubled by a hypothetical: A company does not like reformed drug addicts and wishes to discriminate against them in employment. It knows that the ADA forbids this. Since the company cannot systematically fire or refuse to hire former addicts, it develops a strategy designed to reduce by as much as possible the number of former addicts it employs.

The company ascertains that a drug blood test that is highly effective in people with Types B and O blood (56% of the population) cannot be taken by people with Type A or AB blood (44% of the population). (For these purposes it does not matter whether this is so because Type A/AB people are deathly allergic to the test, or because the test gives false positives in them.) The company then requires *only* former drug addicts in its employ (or those former addicts who would be employed) to take such a test. It does this even though another blood test—which costs no more—is available and would be fully effective in all people regardless of blood type.

The company's strategy is successful. Since Type A/AB one-time addicts constitute 44% of the former addict population, the company has—by instituting the test that they cannot take—reduced the number of past addicts in its employ by almost half (44% to be precise). Yet no one can doubt: (a) that having A or AB type blood is not a protected disability under the ADA, and (b) that more frequent testing of one-time drug addicts (or testing only former addicts) is permitted under the ADA.

It seemed to me that the decision of the court below would have permitted such a

strategy to be used. The decision was based, essentially, on the following line of logic:

(a) Neurogenic bladder condition is not a protected disability under the ADA;

(b) The ADA allows more frequent drug testing of past drug addicts (or indeed testing only of such former addicts);

(c) More frequent drug testing that results in harm to one-time addicts with neurogenic bladders must be permitted under the ADA.

And this logic in its terms would find nothing wrong with the A/AB blood testing strategy.

Nor could one argue, in support of the district court's position, that the case before is substantially different from the offending hypothetical. Since the district court dismissed the case on a Rule 12(b)(6) motion, the plaintiff was precluded from introducing evidence that would indicate that his situation was essentially the same as that in the hypothetical. (This could in theory have been shown by demonstrating that 44% of the population had a neurogenic bladder condition, that another no more costly test that would be effective in all the relevant population was available, etc.) And it is no answer to say that we are all confident (as I surely am) that no evidence of this sort exists, for that is precisely the difference between dismissing a case on a Rule 12(b)(6) motion and letting it proceed to the summary judgment stage, where, if no such evidence was adduced, the defendant would be granted summary judgment.

Accordingly, I wrote an opinion for the panel reversing the district court. *See Buckley v. Consolidated Edison Co.,* 127 F.3d 270, 275 (2d Cir.1997). And the dissent—which, it seemed to me, did not fully avoid the problems of the lower court's reasoning—did not lead me to change my mind. Several things have occurred in the case since then, however, that allow me now to join the opinion of the *in banc* court, and I gladly do so.

First, I have come to agree with the *in banc* court (and the panel dissent) that the way to deal with my dangerous hypothetical is not through the ADA requirement that reasonable accommodations for disabilities must be made. *See* 42 U.S.C. § 12112(b)(5)(A) (1994). (The problems with using that requirement to deal with the hypothetical are as the *in banc* court—in the context of the case before us—describes them.) Conversely, as the *in banc* court also recognizes, the determination that no accommodation is needed does not end the case. The statute also mandates that any drug test administered be *reasonable.*[1] And this additional requirement seems to me sufficient to avoid the dangers implicit in my hypothetical.

But this, of course, raises the issue of whether the plaintiff in the instant case has adequately pleaded that the test used was unreasonable. In this respect, Consolidated Edison ("Con Ed") has made a significant change in its arguments to the *in banc* court. It now maintains that the plaintiff did not plead in more than a conclusory fashion that the testing procedure used was unreasonable.[2] The argument is a winning one on a Rule 12(b)(6) motion, essentially for the reasons the *in banc* court gives. Additionally, since the plaintiff conceded in open court that he could not allege that the drug test was intended to or would, in fact, significantly reduce the number of former drug addicts employed by Con Ed, we needn't consider what effect such allegations would have under the ADA.

I therefore conclude that, as the case is now before us, there is no danger that dismissing the plaintiff's complaint on a 12(b)(6) motion would allow an employer to engage in a strategy akin to that of my hypothetical.

There remains one point to be dealt with, however. The *in banc* court opinion cites a House Report that references a government drug testing manual that employers are "encouraged" to follow. This manual describes urine tests of the kind employed by Con Ed.

---

1. The statute permits disparate treatment of former addicts only when this consists of administering "reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual ... is no longer

engaging in the illegal use of drugs." 42 U.S.C. § 12114(b) (1994).

2. Before the panel Con Ed had contended simply that no accommodation was needed.

The *in banc* court relies on this legislative history to support its holding that the procedure used here was reasonable and that the plaintiff's assertion to the contrary was entirely conclusory. That is fair enough—so long as one does not give the citation more weight than it ought properly to bear.

Let us suppose that, in the future, 44% of the population comes to have a neurogenic bladder condition. (Perhaps as an unfortunate but not disabling effect of the broad spread among men and women of second-generation potency-enhancing drugs.) Let us further suppose that at the same time a simple patch test for drug use has been developed that (a) is no costlier than the previously used urine analysis tests, (b) is as accurate, and (c) can be used on the whole population (those with neurogenic bladders as well as those without). It would surely be wrong to conclude that the fact that a House Report had endorsed urine analysis tests meant that such tests remained reasonable as a matter of law, and that claims of their unreasonableness could not survive a Rule 12(b)(6) motion. Indeed, to continue automatically to endorse urine analysis tests in such circumstances would mean that all the dangers of my A/AB blood hypothetical would be resurrected.

My point is simply this—one may argue about whether the *language* of a statute continues to govern when conditions that the writers of the statute did not imagine have occurred. But even if one feels bound to hold statutory words determinative despite altered circumstances, one surely ought not accord the same authority to legislative history that is not reflected in the language used by the legislators. The example employed in the House Report means no more than that *at that time* and given the then-existing conditions and technologies, a type of testing—standard urine analysis—seemed to the legislators to be not only reasonable but worth encouraging. Whether these tests would meet the statutory test of reasonableness in very different circumstances surely remains an open question.

It is not, however, a question that permits *this* plaintiff to survive a Rule 12(b)(6) motion. He has failed to plead that any significant number of people suffer from neurogenic bladder. He has not claimed that this number or the availability of alternative tests has changed since the House Report urged standard urine analysis. He has, in other words, made no allegations that would cast doubt on the generic reasonableness of the test recommended in the House Report. Accordingly, the conclusion that the reasonableness of the test used was not adequately traversed in the pleading seems to me to be manifestly correct.

Because I agree that the plaintiff has not adequately pleaded that the test employed by Con Ed was unreasonable, and because I do not read the *in banc* court opinion to be saying anything about what allegations might be sufficient to survive a Rule 12(b)(6) motion if conditions involving urine analysis tests were different from what they are today, I concur in both the result and the opinion of the *in banc* court.