Dr. Carl M. GOLDSMITH, Plaintiff,

v.

JACKSON MEMORIAL HOSPITAL
PUBLIC HEALTH TRUST,
Defendant.

No. 97–2805–CIV.

United States District Court,
S.D. Florida.

Dec. 29, 1998.

Nicolas Andres Manzini, Maidenly Sotuyo-Macaluso, Manzini & Associates, Miami, FL, for Carl Goldsmith.

William X. Candela, Dade County Attorney's Office, Miami, FL, for Jackson Memorial Hospital Public Health Trust.

## ORDER GRANTING JACKSON MEMORIAL HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

SEITZ, District Judge.

THIS MATTER is before the Court on Defendant Jackson Memorial Hospital's (the "Hospital") Motion for Summary Judgment (the "Motion"). Plaintiff Carl M. Goldsmith sued the Hospital alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Florida Civil Rights Act ("FCRA"), Fla.Stat. § 760.10 *et seq.* Dr. Goldsmith alleges that the Hospital discriminated against him because of his hand tremors and status as a recovering alcoholic. The Hospital asks this Court to enter summary judgment on the grounds that Dr. Goldsmith has failed to establish a "disability" within the scope of the ADA and FCRA.

The Hospital requires all applicants for physician positions to past a medical qualification examination to assure the safety of patients and the applicant's overall fitness for duty. Dr. Goldsmith's claims arise from the Hospital's initial determination that he was not medically qualified for a primary care physician position at the Hospital's clinic. After careful consideration of the Motion, the arguments of counsel, the relevant law, and the record evidence in the light most favorable to Dr. Goldsmith, the Court concludes that the Hospital's Motion must be granted.

### I. *Factual and Procedural Background*

On February 11, 1996, the Hospital ran an advertisement in *The Miami Herald* seeking part-time physicians for its Liberty City Health Clinic (the "clinic"). The clinic sought to hire a part-time primary care physician and a part-time obstetrics/gynecology physician. On February 13, 1996, Dr. Goldsmith replied to the advertisement by faxing his application to Gordon Hampden in the Hospital's human resources department. Dr. Goldsmith's cover letter clearly indicated that he reviewed the Hospital's advertisement and was "looking for part time work." Between February 11 and April 30, 1996, Dr. Goldsmith was the only applicant for the two advertised positions.

Dr. Goldsmith's application revealed that he was a board certified internist with specialties in internal medicine and nephrology. He attended Harvard College and the University of Virginia Medical School. Thereafter, he completed five years of medical residency. Dr. Goldsmith was licensed to practice medicine in four states and his *curriculum vitae* was extensive. At the time of his application to the Hospital, Dr. Goldsmith was sixty-five years old and had been licensed to practice medicine for over forty years.

After receiving Dr. Goldsmith's application, Mr. Hampden forwarded it to John Cleveland, the clinic's medical director. Dr. Cleveland supervises the clinic's physicians and interviews applicants. On February 18, 1996, Dr. Cleveland interviewed Dr. Goldsmith for the part-time primary care position. Immediately after the interview, Dr. Cleveland recommended to the clinic administrator, Alice Brown, that Dr. Goldsmith be hired. As the clinic's highest ranking employee, Ms. Brown was the only person with authority to hire a physician. Dr. Cleveland introduced Dr. Goldsmith to Ms. Brown and she spoke with him for approximately five minutes. At the conclusion of Dr. Goldsmith's conversation with Ms. Brown, she offered him the job subject to approval of his hospital privileges and a physical examination. Dr. Goldsmith's privileges were approved shortly thereafter. Notably, his application to the credentialing office does not contain any reference to any adverse action ever taken against him on the basis of his hand tremors or alcoholism.

On March 5, 1996, Dr. Goldsmith reported to the Hospital's health services department for his pre-employment "medical screening." Geri Davis, a registered nurse, performed the screening. The examination included a blood pressure test, eye exam, blood test, drug test, height and weight measurements, check of all vitals signs, and health and history screening. As part of his medical history, Dr. Goldsmith indicated he did not consume alcohol, he had never been unable to hold a job or perform job related tasks, nor was his

motion or physical ability restricted. Further, Dr. Goldsmith wrote that he had been a member of Alcoholics Anonymous for seven years. Dr. Goldsmith's drug test showed no evidence of drugs or alcohol. On the examination evaluation form, Ms. Davis indicated that Dr. Goldsmith was "fit for duty." However, the Hospital's employment policies required that Dr. Goldsmith be referred to the employee assistance program to assure that he was continuing with his treatment for alcoholism.[1]

At the weekly patient care conference the next day, Ms. Davis commented on her evaluation of Dr. Goldsmith to her supervisor, Alma Breeden. As the chief administrator of the health services department at the Hospital, Ms. Breeden was responsible for assuring that potential employees were medically qualified and able to perform the job for which they applied. Although Ms. Davis did not identify Dr. Goldsmith's hand tremor on the evaluation form, she told Ms. Breeden that his hand tremors were so severe that Dr. Goldsmith almost spilled his urine sample when performing the standard drug test. Ms. Davis also told Ms. Breeden about Dr. Goldsmith's history of alcoholism. Based on Ms. Davis' concerns about the hand tremor, Ms. Breeden consulted Dr. Greg Brown, her department's medical director. After consulting with Dr. Brown, Ms. Breeden decided that: (1) health services should verify the essential functions of Dr. Goldsmith's position; (2) Dr. Brown should evaluate Dr. Goldsmith; and (3) health services should obtain an evaluation from a psychiatrist specializing in alcoholism.

On March 26, 1996, Ms. Breeden confirmed with Dr. Cleveland that Dr. Goldsmith would be required to perform invasive physical examinations as a primary care physician. She concluded that such examinations would require a steady hand. On April 3, 1996, Dr. Brown completed a full physical and neurological examination of Dr. Goldsmith. Dr. Brown noted a positional hand tremor, but concluded that there were "no contraindications to work performing physical exams or working as physician." On April 9, 1996, Dr. Goldsmith was evaluated by Anthony Albanese, a psychiatrist specializing in alcoholism at Mount Sinai Addiction Treatment Center. Dr. Albanese found no evidence of drug or alcohol use, but he noted that Dr. Goldsmith had a significant resting tremor. Based on his examination, Dr. Albanese recommended that "neuropsychological testing be performed to see if there are any cognitive deficits prior to employment."

On April 17, 1996, Ms. Breeden again met with Dr. Brown to discuss Dr. Goldsmith's evaluation. Thereafter, Ms. Breeden concluded that Dr. Goldsmith was not medically qualified for the job because his hand tremor would interfere with the essential function of conducting physical examinations. Ms. Breeden specifically found that the Hospital lacked complete information to fully assess Dr. Goldsmith's hand tremors. She further concluded that no reasonable accommodation could be made because primary care physicians at the clinic are required to perform invasive examinations without assistance. In a report summarizing her conclusions, Ms. Breeden wrote that Dr. Goldsmith was disqualified because he appeared to have an "unstable medical condition" which may cause injury to a patient. There is no evidence that Dr. Goldsmith's alcoholism played a role in Ms. Breeden's decision to disqualify him.

On April 23, 1996, Ms. Breeden informed Dr. Goldsmith of her decision and that the Hospital's concern was not with "his ability as a doctor but the specific tasks he had to do at the Liberty City job." Shortly thereafter, Dr. Cleveland and Ms. Brown were informed of Ms. Breeden's conclusion that Dr. Goldsmith was not medically qualified for the position. On May 10, 1996, Dr. Goldsmith received a letter rescinding the job offer and

---

1. Dr. Goldsmith met with Anthony Fallon, director of the Hospital's employee assistance program. The purpose of the meeting was not a medical examination, it was simply a standard referral conference to assure that Dr. Goldsmith had completed or was continuing with a rehabilitation program for alcoholism. Mr. Fallon found that Dr. Goldsmith was in good standing with his treatment and that he intended to continue attending counseling sessions during his employment. Mr. Fallon concluded in his report, "I see no reason why Dr. Goldsmith should be kept away from getting the new position at Liberty City." Mr. Fallon's report was sent to the health department after March 11, 1996.

informing him that he could appeal the determination.

Upon learning that Dr. Goldsmith did not pass the Hospital's medical requirements, Ms. Brown and Dr. Cleveland reevaluated the clinic's physician hiring needs because of the lack of applications and physician reassignments. On April 30, 1996, without informing either Ms. Breeden or Dr. Goldstein, they determined that the clinic needed a full-time primary care physician instead of a part-time position because one of the clinic doctors took on the obstetrics/gynecology duties in exchange for having other doctors cover her primary care responsibilities. Once the change was made, the clinic only needed a new full-time primary care physician rather than two part-time physicians. Therefore, Ms. Brown rescinded the solicitations for the part-time physicians and submitted a personnel application to the human resources department posting an opening for a full-time primary care position.

On May 23, 1996, Dr. Goldsmith appealed his disqualification to the Hospital's President. Dr. Goldsmith attached to his appeal Dr. Victor H. Barredo's neurological report which provided that he had a "mild positional tremor" that would not "impair his ability to function as a physician." On June 5, 1996, after reviewing the appeal and Dr. Barredo's neurological report, Ms. Breeden agreed that Dr. Goldsmith was medically qualified and should be cleared for employment, subject to a probationary period. Thus, Ms. Breeden notified the hospital's human resources department that Dr. Goldsmith was medically qualified for employment. There is no evidence that Ms. Breeden knew either that Dr. Goldsmith sought only a part-time position or that the part-time position had been eliminated at any time during the medical evaluation or during Ms. Breeden's review of Dr. Barredo's report.

After receiving Ms. Breeden's evaluation, the human resources department offered Dr. Goldsmith the open position at the clinic, full-time primary care physician. On June 28, 1996, Dr. Goldsmith rejected the offer. Dr. Goldsmith's rejection protested that he did not seek full-time employment, that the offer was at a reduced wage from the prior offer, and that the offer carried a full benefits package which Dr. Goldsmith did not desire. On August 6, 1996, Dr. Goldsmith filed a charge against the Hospital with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a letter of determination and a notice of right to sue in June of 1997. On August 28, 1997, Dr. Goldsmith sued the Hospital. After discovery, the Hospital filed this Motion.

## II. *Standard for Summary Judgment*

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Turnes v. AmSouth Bank,* 36 F.3d 1057, 1060 (11th Cir.1994). For the purposes of this motion, the evidence and all reasonable factual inferences drawn from that evidence are viewed in the light most favorable to Dr. Goldsmith. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642 (11th Cir. 1997).

## III. *Analysis*

■ The threshold issue before the Court is whether Dr. Goldsmith has established a *prima facie* violation of the ADA and FCRA.[2] To meet this threshold, Dr. Goldsmith must present evidence that he (1) has a "disability;" (2) is a "qualified" individual; and (3) was discriminated against because of the "disability." *Terrell v. USAir,* 132 F.3d 621, 624 (11th Cir.1998); *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.1996), *amended on reh'g in part,* 102 F.3d 1118 (11th Cir.1996) (no substantive amendments of opinion), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). The sole issue before the Court is whether Dr. Goldsmith has produced suffi-

---

**2.** FCRA contains Florida's counterpart to the ADA. *Malewski v. NationsBank of Florida, N.A.,* 978 F.Supp. 1095, 1104 (S.D.Fla.1997) (FCRA is closely patterned after its federal equivalent). "If a Florida statute is modeled after a federal law on the same subject, the Florida statute will take on the same construction as placed on its federal prototype, insofar as such interpretation is harmonious with the spirit and policy of the Florida legislation." *Edwards v. Wallace Community College,* 49 F.3d 1517 (11th Cir.1995). Therefore, the following analysis addressing Dr. Goldsmith's ADA claim also applies to his FCRA claim.

cient evidence that he has a recognized "disability" under the ADA.

Dr. Goldsmith asserts that he meets the ADA's "disability" requirement because the Hospital regarded his hand tremors and alcoholism as a disability. In turn, the Hospital asserts that Dr. Goldsmith has failed to establish a disability because no evidence suggests that the Hospital ever regarded him as significantly restricted from performing a "class or a broad range of jobs in various classes" as required by the ADA. After a careful review of the facts and law, the Court agrees that Dr. Goldsmith has failed to establish a "disability" under the theory that the Hospital regarded him as disabled. *See* 42 U.S.C. § 12102(2)(C). This does not end the inquiry, however, because Dr. Goldsmith asserts that his record of alcoholism standing alone establishes a *per se* disability under the ADA. Although the Hospital does not specifically address this issue in its Motion, the Court finds that a disability cannot be established by merely asserting status as a recovering alcoholic. *See* 42 U.S.C. § 12102(2)(B).

A. *The Hand Tremor and Alcoholism Were Not Regarded as Disabilities that Substantially Limited Working Because the Hospital Did Not Regard Dr. Goldsmith as Unable to Perform a Class or a Broad Range of Jobs*

 The starting point for determining whether the Hospital regarded Dr. Goldsmith as disabled is the ADA's definition of "disability." For the purpose of addressing this argument, the ADA states that "disability" means "being regarded as having" ... "a physical or mental impairment that substan-

tially limits [3] one or more of the major life activities [4] of such individual." 42 U.S.C. § 12102(2)(C) *incorporating* (A). Dr. Goldsmith claims that the Hospital regarded his hand tremor and alcoholism as impairments that substantially limited the major life activity of working. To establish this claim, Dr. Goldsmith must put forth evidence that the Hospital regarded him as significantly restricted in the ability to perform either a class of jobs [5] or a broad range of jobs in various classes [6] as compared to the average person having comparable training, skills and abilities. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369–70 (11th Cir.1998) (an employers perception that an applicant is unable to perform a single, particular job does not constitute a substantial limitation in the major life activity of working).

The record reveals that there is no material disputed issue of fact as to whether the Hospital regarded Dr. Goldsmith as being significantly restricted in his ability to perform either a class or a broad range of jobs in various classes. To the contrary, the record establishes that the Hospital's concern at the time of the April 23, 1996 disqualification was Dr. Goldsmith's ability to safely perform invasive examination procedures which would be required at the clinic. Dr. Goldsmith has failed to adduce any evidence rebutting this fact. Further, uncontroverted evidence establishes that the Hospital ultimately determined that Dr. Goldsmith was qualified for a full-time position as a primary care physician and offered him such a position.

The court in *Witter* held that an impairment does not substantially limit the ability

---

**3.** The term "substantially limits" has been interpreted to mean: (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j).

**4.** "Major life activities" refers to functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i).

**5.** "Class of jobs" means "the job from which the individual has been disqualified because of an

impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B).

**6.** "Broad range of jobs in various classes" has been defined as "the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C).

to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs. *Id.* at 1369–70 (*citing* 29 C.F.R. § 1630.2(j)(3)(i) and *Pritchard*, 92 F.3d at 1133). Uncontroverted evidence establishes that Ms. Breeden disqualified Dr. Goldsmith from the position of primary care physician at the clinic because she determined that Dr. Goldsmith could not safely perform invasive physical examinations as required in that position. Nothing suggests that Ms. Breeden's decision was based on a determination that Dr. Goldsmith was not qualified to practice medicine. Thus, the uncontroverted facts establish that Dr. Goldsmith was merely precluded from a narrow range of jobs, or those that required him to perform invasive physical examinations.

There are numerous positions that a physician may hold without conducting invasive physical examinations. There is simply no evidence that the Hospital regarded Dr. Goldsmith as precluded from any of these other positions. In fact, the Hospital ultimately offered Dr. Goldsmith a job as a primary care physician, so it could not have regarded him as precluded from a class·or broad range of jobs. Further, the Hospital maintained a program designed to assist physicians who experience problems with alcohol. This program speaks to the fact that the Hospital did not regard alcoholism generally as a complete bar to practicing medicine.

B. *Asserting Status as a Recovering Alcoholic is Insufficient to Meet the Prima Facie Element of "Disability" under the ADA*

■ The starting point for determining whether Dr. Goldsmith's record of alcoholism establishes a disability under the ADA is, once again, the ADA's definition of "disability." For the purpose of addressing this argument, the ADA states that "disability" means "a record of" ... "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(B) *incorporating* (A). The terms in this definition are defined in exactly the same manner as those in the preceding analysis under Section 12102(2)(C). However, unlike the preceding analysis, Dr. Goldsmith's claim is not that the

Hospital regarded him as "substantially limited" in his ability to work, but that, as a recovering alcoholic, he had a record of impairment that "substantially limited" a major life activity.

To meet this burden under the ADA, Dr. Goldsmith is required to offer evidence that his alcoholism "substantially limited" a major life activity such as caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working. *See* 29 C.F.R. § 1630.2(i). However, Dr. Goldsmith argues that alcoholism is a *per se* disability under that ADA, and, therefore, he need not establish that his alcoholism substantially limited a major life activity. Although alcoholics may be detrimentally impacted in many facets of their lives by their addiction, the ADA requires an individualized determination of impact, not simply an assumption.

■ Dr. Goldsmith argues that 42 U.S.C. § 12102(2)(B) only requires a claimant to assert a record of alcoholism. Although the ADA does not define the terms "record of such an impairment," courts and regulations agree that a "record of such impairment" means having a history of impairment that substantially limits a major life activity. *Burch v. Coca–Cola Co.*, 119 F.3d 305, 321 (5th Cir.1997) (*citing* 29 C.F.R. § 1630, App. (1996)), *cert. denied*, —— U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *see also Buckley v. Consolidated Edison Co.*, 127 F.3d 270, 273–74 (2d Cir.1997), *vacated by* 155 F.3d 150, 154 (2d Cir.1998) (*En banc*) (more frequent drug tests for identified past drug abusers does not violate ADA). The court in *Burch* states as follows:

[t]he EEOC's interpretive guidance makes plain, the ADA does· not attempt to set forth a laundry list of impairments that are disabilities. See 29 C.F.R. § 1630, App. (1996) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others....."). Unlike HIV infection, the EEOC has not attempted to classify

alcoholism as a *per se* disability, and we decline to adopt such a questionable position.

*Id.* at 315–16 (*case citations omitted*).

 The ADA requires an individualized determination that a claimant has a history of impairment, thus alcoholism cannot be classified a *per se* disability. *Burch,* 119 F.3d at 315–16 ("individualized inquiry required by the ADA"). In order to satisfy the "disability" standard under section 12102(2)(B), Dr. Goldsmith must establish a record of alcoholism that evidences an impairment that substantially limits a major life activity. *Id.* at 321.

Even when all factual inferences are viewed in the light most favorable to Dr. Goldsmith, there is no material disputed fact as to whether his alcoholism substantially limited a major life activity, such as working, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning. *See* 29 C.F.R. § 1630.2(i). Dr. Goldsmith's affidavit provides that "during the active stage of my drinking, I had the usual limitations caused by alcoholism, including limitation in performing manual tasks, socializing, driving, etc." In short, the affidavit is unavailing because the "usual limitations" does not mean "substantial limitations," and either way it forces the Court to assumes all alcoholics are similarly and equally impacted. Further, Dr. Goldsmith's affidavit appears to only address temporary limitations attributable to alcohol consumption.

 It is undisputed, however, that Dr. Goldsmith has a record of treatment for alcoholism. Dr. Goldsmith and Mr. Fallon testified that he had participated in Alcoholics Anonymous. When asked if he had ever relapsed after joining Alcoholics Anonymous, Dr. Goldsmith said "No. I had a glass of wine on New Year's Eve maybe. I don't consider that a relapse." He also testified that he joined Alcoholics Anonymous in 1986 on his own volition and that he attends three or four meetings a year, and does not have a sponsor in the program. History of treatment does not, however, establish that alcoholism substantially impacted a major life activity. *See Burch,* 119 F.3d at 322.

With regard to one major life activity, Dr. Goldsmith indicated on his medical history questionnaire that he had never been unable to hold a job or to perform job related tasks. A claimant must present sufficient evidence to create a material disputed issue of fact that his alcoholism "substantially limited" one or more major life activities. Dr. Goldsmith has not produced such required evidence.

### III. *Conclusion*

Caution is appropriate when considering summary judgment for an employer in a discrimination action, and for the purposes of this Motion, the evidence and all reasonable factual inferences drawn from that evidence have been viewed in the light most favorable to Dr. Goldsmith. There is no evidence, however, that the Hospital ever regarded Dr. Goldsmith as restricted from performing a class or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. Further, Dr. Goldsmith has failed to offer evidence that his alcoholism substantially limited a major life activity. Therefore, the Hospital is entitled to summary judgment as a matter of law, and it is hereby ordered that the Hospital's Motion for Summary Judgment is granted.