**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 9 1998**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

JOSEPH C. NIELSEN, individually
and on behalf of all similarly situated
shareholders of Moroni Feed
Company,

      Plaintiff-Appellant,

v.

MORONI FEED COMPANY, a Utah
Corporation; TIM BLACKHAM,
Individually and as Chairman of the
Board of Directors of Moroni Feed
Company; DAVID BAILEY,
individually and as President of
Moroni Feed Company; CAROL
BLAIN, individually; FRANK COOK,
individually and as Vice President of
Moroni Feed Company; BLAKE
DONALDSON, individually; and
PARRY OLSON, individually and as a
member of the Board of Directors of
Moroni Feed Company,

      Defendants-Appellees.

No. 97-4118

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:95CV 0910S)

David L. Barclay and Lynn S. Davies, Richards, Brandt, Miller & Nelson, Salt
Lake City, Utah (Mark L. McCarty with them on the briefs) for Appellant-
Petitioner.

Stanley J. Preston, Snow, Christensen & Martineau, Salt Lake City, Utah (Michael R. Carlston and Camille N. Johnson with him on the briefs) for Appellees-Respondents.

Before **SEYMOUR,** Chief Judge, and **EBEL** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

Joseph C. Nielsen ("Nielsen") was terminated from his position as President of the Moroni Feed Company ("Moroni Feed") after repeated incidents in which Nielsen was found, uninvited, in private homes in the local community, including the homes of Moroni Feed employees. Nielsen sued Moroni Feed under the ADA, claiming that the real reason for his termination was an erroneous perception on behalf of his employer that he illegally used prescription pain-killing drugs and that he was addicted to such drugs. He also sued Moroni Feed under various state causes of action. The district court granted Moroni Feed's motion for summary judgment and then dismissed Nielsen's state claims for lack of jurisdiction. Nielsen now appeals. We affirm.

## I. BACKGROUND

Moroni Feed is a farming cooperative whose membership consists mainly

of turkey growers operating in Sanpete County, Utah. Nielsen began his employment with Moroni Feed in 1970 and served as President of the co-op for the ten years prior to his termination in 1995. For many years prior to the events that led up to his termination, Nielsen had been taking prescription pain-killing medication as a result of a number of chronic ailments, including arthritis, back pain, shingles, Barrett's esophagus, and others.

In September, 1994, Moroni Feed received a report that Nielsen was found to have entered the home of Board Member Parry Olson ("Olson") without permission. This was the second time Nielsen had entered that particular home without permission, both times on a Sunday morning, when the Olson family regularly attended church. The Chairman of the Board of Moroni Feed, Tim Blackham ("Blackham"), testified in his deposition that he discussed these incidents with Nielsen and requested that Nielsen cease entering homes uninvited. According to Blackham, Nielsen promised that it would never happen again.[1] On the morning of March 27, 1995, Nielsen was found, uninvited, in the home of Moroni Feed employee Carol Blain ("Blain") by the Blains' daughter, who was home alone and still in her pajamas. A criminal trespass complaint was filed

---

[1] Nielsen claims that he has no recollection of this request by Blackham, and further asserts that even if the request was made there was no indication made to him that failure to honor the request would result in disciplinary action or termination.

- 3 -

against Nielsen as a result of that entry.[2] By the time of Nielsen's ultimate termination, Moroni Feed had received a total of eight reports of Nielsen's unauthorized entry into private homes in the Sanpete County area.[3]

Following the incident at the Blain home, the Moroni Feed Board of Directors met to discuss the situation. Olson told the Board that Nielsen had confided in him that Nielsen had a "drug problem."[4] Some members of the Board subsequently met with a psychologist to discuss Nielsen's behavior; at this meeting members of the Board indicated that they perceived Nielsen to be suffering from a drug problem that was interfering with Nielsen's performance of his duties as President of the company. Board Member David Bailey ("Bailey") confided in co-op member Doug Neeley ("Neeley") that he was actively seeking

---

[2] Nielsen claims that because he entered into a nolo contendere agreement regarding that entry, evidence of that charge should not have been considered by the district court at summary judgment. While we agree that evidence of a nolo contendere plea is not admissible as evidence under Fed. R. Evid. 410, it is not the plea, but rather the charge by the Blain family of unwarranted entry that was relevant to the issue of whether Nielsen was engaged in a pattern of behavior of entering private homes without permission.

[3] After Nielsen's termination, Moroni Feed became aware of eleven more such unauthorized entries by Nielsen into private homes. Nielsen appeals the district court's denial of a motion to strike portions of an affidavit recounting one of these incidents (the second entry of Mary Gibson's home) as "irrelevant and hearsay." We find no abuse of discretion in the district court's ruling. See Duffee v. Murray Ohio Mfg. Co., 91 F.3d 1410, 1411 (10th Cir. 1996) (evidentiary rulings are generally reviewed for abuse of discretion).

[4] The reference to drugs was a reference to prescription painkillers. Nielsen denies that he ever told Olson that he had a drug problem.

Nielsen's ouster due to Nielsen's deficient performance as President. From their conversation, Neeley received the impression that Nielsen had a drug problem, although Bailey did not explicitly say so.

In his affidavit, Nielsen stated that members of the Board told Nielsen that they believed that he had a drug problem, that they believed he was going into homes to steal drugs, and that the problem was set to be discussed at an upcoming Board meeting. Ultimately, the Board decided to make Bailey acting President. Upon learning the news, Nielsen registered his displeasure, and the Board suspended its decision. Nielsen then met with the Board to discuss the situation, at which time the Board indicated to Nielsen that its decision was based upon Nielsen's unauthorized entry into private homes. The Board neither confirmed nor denied that its decision was based upon a perceived drug problem, but it requested that Nielsen be admitted to Dayspring, a drug treatment center, for evaluation. Nielsen agreed. Nielsen's discharge report from Dayspring indicates that he had been admitted "for evaluation of a possible chemical dependency problem . . . . It was felt by his company that he was going into these homes to steal drugs, because he had a drug problem." After three days of evaluation, the Dayspring staff determined that Nielsen was not chemically dependent, and Nielsen was discharged. The Moroni Feed Board of Directors was aware of this diagnosis.

On April 17, Nielsen returned to Moroni Feed, reported his experiences at Dayspring to the Board, and was instructed to "get back to work." However, the next day Blackham terminated Nielsen, informing Nielsen that he was taking this action because Nielsen had lost the trust of the Board, the managers, and the membership of the co-op "through his conduct of going into people's homes in an inappropriate fashion." The Board ratified Blackham's termination of Nielsen.

Nielsen simultaneously filed disability-based discrimination claims with the EEOC and the Utah Anti-Discriminatory Division. After receiving a right-to-sue letter from the EEOC, Nielsen filed suit in federal district court, claiming discrimination in employment on the basis of a perceived disability, in violation of the Americans with Disabilities Act ("ADA") and the Utah Anti-Discriminatory Act. Nielsen also brought a myriad of other state-law claims, including wrongful termination, breach of contract, defamation, negligence, intentional infliction of emotional distress, and others. Nielsen named as defendants Moroni Feed as well as six Moroni Feed employees, including Blackham, Bailey, Blain, and Olson.[5]

---

[5]We do not reach the question of whether persons can be sued in their individual capacities under the ADA. See Land v. Midwest Office Tech., Inc., 979 F. Supp. 1344, 1348 (D. Kan. 1997) (noting that Tenth Circuit has never ruled on this exact question but listing cases from other courts and concluding that this circuit would probably not allow such suits under ADA without requisite showing that defendant met statutory definition of "employer").

During discovery Moroni Feed deposed Nielsen's healthcare providers, and in the process collected evidence tending to show that Nielsen obtained large amounts of prescription painkillers from a number of different doctors, that in doing so he may have falsely told some of those doctors that he was not currently receiving painkillers from other sources, and that some of his treating physicians were concerned that Nielsen might have a dependency on prescription painkillers. At the close of discovery both parties moved for summary judgment. The district court granted summary judgment to Moroni Feed on Nielsen's ADA claim, on the ground that Moroni Feed terminated Nielsen because of his home-entering activity and not because of a disability, real or perceived. Because the ADA claim was the sole source of federal court jurisdiction, the district court exercised its discretion and dismissed all of Nielsen's state law claims as well. Nielsen appeals the district court's grant of summary judgment to Moroni Feed on his ADA claim.[6]

## II. ANALYSIS

A. Law

The ADA provides:

---

[6] Nielsen does not contest the district court's decision to deny jurisdiction over his state law claims based upon the court's finding that Nielsen's ADA claim failed on summary judgment.

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The statute defines the term "disability" as any of the following:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

Id. § 12102(2). Thus, in passing the ADA, Congress intended to protect individuals from employment discrimination by employers on the basis of an actual or perceived disability, provided that the disability substantially limits or is perceived to limit substantially a major life activity.

While it is clear that the ADA protects against discrimination on the basis of a disability or a perceived disability, this court and other circuit courts have wrestled with the relationship between a disability and conduct related to that disability. In Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1088 (10th Cir. 1997), this court held that ordinarily conduct caused by a qualifying disability is protected by the ADA. Den Hartog involved a claim of mental illness, and in that context we explained that "[t]o permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would

- 8 -

largely nullify the ADA's protection of the mentally disabled." Id. at 1087.

We noted, however, that the ADA's protection of disability-caused conduct is subject to certain limitations found in the Act. First, a disabled employee "may be held to any performance criteria that are job-related and consistent with business necessity, so long as the disabled employee is given the opportunity to meet such performance criteria by reasonable accommodation." Id. at 1086 n.8 (citing 42 U.S.C. § 12113(a)). Second, an employer need only make reasonable accommodation, and need not make any accommodation that would constitute an "undue hardship." Id. at 1087 (citing 42 U.S.C. § 12112(b)(5)(A)). Third, an employer may take action against an employee who poses a "direct threat" to the health or safety of other individuals in the workplace. Id. (citing 42 U.S.C. § 12113(b)). Subject to these restrictions, which contemplate an employer dealing with an employee's conduct, we concluded that the ADA's general anti-discrimination provision, 42 U.S.C. § 12112(a), does not contemplate "a stark dichotomy between 'disability' and 'disability-caused misconduct,'" but rather protects both. Den Hartog, 129 F.3d at 1088.

One area, however, where the ADA and the Rehabilitation Act[7] recognize a

---

[7]The ADA defines disability in essentially the same terms as the Rehabilitation Act. See Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994); Collings v. Longview Fibre Co., 63 F.3d 828, 832 n.3 (9th Cir. 1995). The ADA enlarges the scope of the Rehabilitation Act to cover private employers, but

(continued...)

dichotomy between a disability and disability-caused misconduct is where the disability is related to alcoholism or illegal drug use. See Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1182-83 (6th Cir. 1997) (ADA); Despears v. Milwaukee County, 63 F.3d 635, 637 (7th Cir. 1995) (ADA and Rehabilitation Act); Maddox v. University of Tennessee, 62 F.3d 843, 847-48 (6th Cir. 1995) (Rehabilitation Act); Collings v. Longview Fibre Co., 63 F.3d 828, 833 (9th Cir. 1995) (ADA); Little v. F.B.I., 1 F.3d 255, 258-59 (4th Cir. 1993) (Rehabilitation Act); cf. Taub v. Frank, 957 F.2d 8, 11 (1st Cir. 1992) (addiction-related possession of heroin for distribution too attenuated to be covered by Rehabilitation Act). Although these cases often state in general terms that a disability is protected while disability-caused misconduct is not, they all make this distinction in the context of alcoholism or illegal drug use. See Mararri, 130 F.3d at 1182-83; Despears, 63 F.3d at 637; Maddox, 62 F.3d at 847-48; Collings, 63 F.3d at 832-33; Little, 1 F.3d at 258-59; Taub, 957 F.2d at 11. We too have noted such a distinction when alcoholism or illegal drug use is involved. See Den Hartog, 129 F.3d at 1086 (ADA); Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir. 1996) (Rehabilitation

_____

[7](...continued)
the legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act to be incorporated by reference when interpreting the ADA. See Bolton, 36 F.3d at 943; Collings, 63 F.3d at 832 n.3; see also Maddox v. University of Tennessee, 62 F.3d 843, 846 n.2 (6th Cir. 1995) ("The ADA parallels the protection of the Rehabilitation Act . . . .").

Act).[8]

The reason this dichotomy exists in the context of alcoholism and illegal drug use is simple: both the ADA and the Rehabilitation Act clearly contemplate removing from statutory protection unsatisfactory conduct caused by alcoholism and illegal drug use. Specifically, the ADA states that a covered entity

> may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee . . . .

42 U.S.C. § 12114(c)(4). The Rehabilitation Act similarly removes unsatisfactory conduct caused by alcoholism from its purview, stating that the term "'individual with a disability' . . . does not include any individual who is an alcoholic whose current use of alcohol prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol abuse, would constitute a direct threat to property or the safety of others." 29 U.S.C. § 706(8)(C)(v); see also 42 Fed. Reg. 22,686 (1977) (Secretary of Department of

_____

[8]Only the Second Circuit has found otherwise, refusing to treat the status of a disability differently from the conduct it causes in the context of alcoholism and drug addiction. See Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511, 517 (2d Cir. 1991) (holding that termination for absenteeism caused by alcoholism violates the Rehabilitation Act); Cushing v. Moore, 970 F.2d 1103, 1108 (2d Cir. 1992) (applying Teahan in context of drug addiction). This court has specifically disapproved of this aspect of Teahan. See Williams, 79 F.3d at 1007.

Health, Education, and Welfare stating, in promulgating regulation under 29 U.S.C. § 706 of Rehabilitation Act, that an alcoholic or drug addict may be held "to the same standard of performance and behavior" as others, and that, "while an alcoholic or drug addict may not be denied services or disqualified from employment solely because of his or her condition, the behavioral manifestations of the condition may be taken into account in determining whether he or she is qualified").

Thus, unsatisfactory conduct caused by alcoholism and illegal drug use does not receive protection under the ADA or the Rehabilitation Act. However, the mere status of being an alcoholic or illegal drug user may merit such protection. See Williams, 79 F.3d at 1005 (alcoholism covered under Rehabilitation Act); Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1059 n.10 (7th Cir. 1998) (citing cases finding alcoholism covered under ADA); Evans v. Federal Express Corp., 133 F.3d 137, 139 (1st Cir. 1998) (citing cases finding alcoholism covered under both statutes); Buckley v. Consol. Edison Co. of New York, Inc., 127 F.3d 270, 273-74 (2d Cir. 1997) (alcoholism and drug addiction covered under ADA), vacated en banc on other grounds, 155 F.3d 150 (2d Cir. 1998); Mararri, 130 F.3d 1180, 1180 (6th Cir. 1997) (alcoholism covered under ADA). "[B]ecause Congress only expressly permitted employers to hold illegal drug users and alcoholics to the same

objective standards of conduct as other employees even though their disability causes misconduct or poor performance, Congress implicitly did not intend to extend the same employer prerogative to employees with other disabilities." Den Hartog, 129 F.3d at 1086 (citing Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980)) (emphasis original). As a result, we observe that the status-conduct dichotomy exists only in the contexts of alcoholism and illegal drug use. Outside of those contexts, as we held in Den Hartog, the ADA protects both the disability and the conduct caused by the disability. See 129 F.3d at 1088.[9]

Significantly, while the mere status of being an illegal drug user may invoke protection under the ADA, that protection does not extend to those "currently engaging in the illegal use of drugs." 42 U.S.C. § 12114(a) (excluding from definition of "individual with a disability" individuals currently engaged in illegal use of drugs); see also 29 C.F.R. § 1630.3 App. ("Employers . . . may discharge or deny employment to persons who illegally use drugs, on the basis of such use, without fear of being held liable for discrimination."); Shafer v. Preston

_____

[9]We note that in Siefken v. Village of Arlington Heights, 65 F.3d 664, 665-66 (7th Cir. 1995), the Seventh Circuit affirmed a grant of summary judgment against a plaintiff terminated on account of disability-caused misconduct not related to alcoholism or drug addiction. However, as we observed in Den Hartog, see 129 F.3d at 1087, the Siefken court decided the case on the ground of proximate cause, holding that "but for" causation is not enough under the ADA. The Seventh Circuit did not adopt the proposition that disability-caused misconduct is never protected under the ADA.

- 13 -

Mem'l Hosp. Corp., 107 F.3d 274, 280 (4th Cir. 1997) ("In light of the plain statutory language, the relevant legislative history, and the EEOC's interpretive guidelines, we conclude that an employee illegally using drugs in the weeks and months prior to discharge is a 'current' illegal user of drugs for purposes of the ADA . . . ."). On the other hand, the ADA specifically exempts from the exclusion of § 12114(a), and hence protects, an individual who

> (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
> (3) is erroneously regarded as engaging in such use, but is not engaged in such use.

42 U.S.C. § 12114(b).[10]

Because § 12114(b)(3) excludes erroneous perception of illegal drug use from being disallowed as a disability under § 12114(a), the ADA protects employees who are erroneously regarded as being current illegal drug users. See Buckley, 127 F.3d at 273 (stating that committee reports make clear that "'[i]n removing protection for persons who currently use illegal drugs, the Committee does not intend to affect coverage for individuals who have a past drug problem

_____

[10]Similarly, the Rehabilitation Act excludes current illegal drug users from its coverage, see 29 U.S.C. § 706(8)(C)(i), but exempts from that exclusion individuals satisfying criteria identical to 42 U.S.C. § 12114(b), see 29 U.S.C. § 706(8)(C)(ii).

or are erroneously perceived as having a current drug problem'") (quoting H.R. Rep. No. 101-485(II), at 77 (1990)), vacated en banc on other grounds, 155 F.3d 150 (2d Cir. 1998); Collings, 63 F.3d at 832 (stating that the ADA protects "individuals who are erroneously regarded as using drugs when in fact they are not") (citing § 12114(b)); Jones v. Corrections Corp. of America, 993 F. Supp. 1384, 1386 (D. Kan. 1998) ("a plaintiff can establish that he is disabled within the meaning of the ADA by showing that he was regarded as being addicted to drugs, but was in fact not engaging in such drug use"); Herman v. City of Allentown, 985 F. Supp. 569, 576, 578-79 (E.D. Pa. 1997) (same); Ackridge v. Comm'r, Dept. of Human Servs., Civ. A. No. 93-6783, 1994 WL 184421, at *1-2 (E.D. Pa. May 5, 1994) (noting that ADA coverage extends to employee who is erroneously regarded as engaging in illegal drug use); Sharon Dietrich et al., Work Reform: The Other Side of Welfare Reform, 9 Stan. L. & Pol'y Rev. 53, 55 (1998) (same). However, the erroneous perception of being an illegal drug user is to be treated like any other perception of a disability, and is only to be considered a qualifying disability if the employer perceives the disability to substantially limit a major life activity. See 42 U.S.C. § 12102(2) (definition of disability includes being regarded as having "a physical or mental impairment that substantially limits one or more major life activities of such individual"); 29 C.F.R. § 1630.3, App. (noting that individuals who are

erroneously considered by their employers to be illegally using drugs "are still required to establish that they satisfy the requirements of [the statutory and regulatory] definitions in order to be protected by the ADA."); H.R. Rep. No. 101-485 (II), at 77 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 360 (noting that individuals with perceived drug use dependence may satisfy definition of disability by proving that they "are regarded as having a disability, as 'disability' has been defined under section 504 [of the Rehabilitation Act] and [the ADA] (i.e., a physical or mental impairment that substantially limits a major life activity)"); see also E.E.O.C. v. Exxon Corp., 973 F. Supp. 612, 613-14 (N.D. Tex. 1997) (stating that "individual who falls under one of the subcategories of 42 U.S.C. § 12114(b) is not automatically a 'qualified person with a disability' for purposes of protection under the ADA," but "must prove they suffer from a 'disability' as that term is defined in 42 U.S.C. § 12102(2)") (citations omitted).[11]

---

[11] The term "major life activities" includes "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1444 (10th Cir.1996) (quoting 29 C.F.R. § 1630.2(i)) (emphasis original). The Supreme Court recently added to this list the major life activity of sexual reproduction. See Bragdon v. Abbott, 118 S. Ct. 2196, 2205 (1998). For a physical or mental impairment to be "substantially limiting" the individual must be: "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life

(continued...)

Therefore, Nielsen could avoid summary judgment only by presenting evidence to the district court that, when taken in the light most favorable to Nielsen, would have allowed a reasonable jury to conclude (1) that Nielsen had a perceived disability protected under the ADA because Moroni Feed erroneously believed he was illegally using drugs and that the perceived use was severe enough to substantially limit one or more of his major life activities, and (2) that Moroni Feed terminated Nielsen on the basis of this perceived disability or conduct erroneously attributed to it.

B.  Application

Nielsen has failed to present evidence showing a genuine dispute of material fact in this regard.  First, Nielsen has failed to produce any evidence that Moroni Feed erroneously believed he was illegally using drugs which use was severe enough to substantially limit one or more of his major life activities. While Nielsen did present evidence that at least some decision-makers at Moroni Feed at some point were concerned about his behavior and about his perceived addiction to prescription painkillers,[12] Nielsen proffered no evidence that anyone

[11](...continued)
activity.”  29 C.F.R. § 1630.2(j)(1).

[12]There is no doubt that, under the ADA, illegal drug use includes the illegal misuse of pain-killing drugs which are controlled by prescription as well as
(continued...)

- 17 -

at Moroni Feed believed this perceived drug addiction was severe enough to substantially limit one or more of his major life activities. Indeed, Nielsen failed to state explicitly what major life activities, if any, Moroni Feed regarded as substantially limited by the perceived drug addiction. Nielsen simply argued that Moroni Feed "fired him due to his perceived disability in violation of the ADA." Hence, in terms of substantial limitation of a major life activity, the most we can infer from Nielsen's argument is a contention that Moroni Feed fired him because it believed he suffered from a drug addiction severe enough to prevent him from performing his duties as President of the co-op. However, such a contention, even if true, falls well short of establishing that Moroni Feed regarded Nielsen as having a disability substantially limiting the only major life activity implicated by Nielsen's argument—namely, working.

In Sutton v. United Air Lines, Inc., 130 F.3d 893 (10th Cir. 1997), we noted that "'[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" Id. at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(i)) (other citations omitted). Moreover, "[a]n employer does not necessarily regard an employee as substantially limited in the major life

---

[12](...continued)
illegal street drugs like cocaine. See 29 C.F.R. § 1630.3, App. ("Illegal use of drugs refers both to the use of unlawful drugs, such as cocaine, and to the unlawful use of prescription drugs.").

- 18 -

activity of working simply because it believes that individual is incapable of performing a particular job." Id. Rather, in order

> [t]o demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[] restrict[ion] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(j)(3)(i)) (emphasis original); accord Sutton, 130 F.3d at 904; Mendoza v. Borden, Inc., No. 97-5121, 1998 WL 751038, at *2 (11th Cir. Oct. 28, 1998); Colwell v. Suffolk County Police Dept., No. 97-9019, 1998 WL 718358, at *7 (2d Cir. Oct. 15, 1998); Gutridge v. Clure, 153 F.3d 898, 900 (8th Cir. 1998); Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998); Deas v. River West, L.P., 152 F.3d 471, 481 (5th Cir. 1998); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 302-03 (4th Cir. 1998); Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 n.7 (3d Cir. 1998); McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 372 (6th Cir. 1997); Thompson v. Holy Family Hosp., 121 F.3d 537, 540 (9th Cir. 1997); John F. Wagner, Annotation, What Constitutes Substantial Limitation on Major Life Activity of Working for Purposes of Americans with Disabilities Act, 141 A.L.R. Fed. 603, § 2(a) (1997).[13]  In other words, "'[a]n impairment must

---

[13]When an individual claims substantial limitation in the major life activity of working, three additional factors also may be considered:

(continued...)

substantially limit employment in general, not merely the particular job that the plaintiff may wish to hold.'" Sutton, 130 F.3d at 904 (quoting Hileman v. City of Dallas, 115 F.3d 352, 354 (5th Cir. 1997)).

> Therefore, in order to establish a disability under the 'regarded as' prong of the ADA with respect to the major life activity of working, an individual must show that the employer regarded him or her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes.

Id. Because Nielsen merely presented evidence suggesting that Moroni Feed no longer believed him capable of performing his duties as President of the co-op, but presented no evidence whatsoever that Moroni Feed believed any perceived illegal drug addiction on his part significantly restricted his "ability to perform either a class of jobs or a broad range of jobs in various classes," Bolton, 36 F.3d at 942, we must affirm the district court's entry of summary judgment. See

---

[13](...continued)
(A) [t]he geographical area to which the individual has reasonable access;
(B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
(C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

Bolton, 36 F.3d at 943 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)).

Sutton, 130 F.3d at 904; cf. Siemon v. AT&T Corp., 117 F.3d 1173, 1176 (10th Cir. 1997) (where "it is clear that [the plaintiff] has fallen far short of alleging he is substantially limited in performing a class of jobs or a broad range of jobs in various classes," the district court "correctly granted summary judgment"); Bolton, 36 F.3d at 944 (affirming summary judgment where plaintiff "failed to produce evidence showing a significant restriction in his 'ability to perform either a class of jobs or a broad range of jobs in various classes'") (quoting 29 C.F.R. § 1630.2(j)3)(i)); Welsh v. City of Tulsa, 977 F.2d 1415, 1419 (10th Cir. 1992) (affirming summary judgment on perceived disability claim under Rehabilitation Act where, inter alia, plaintiff "failed to present evidence" that he would be precluded not only from performing "the specific job" for which he applied, "but a wide range of jobs," if he had disability as perceived by defendant).

In addition to Nielsen's failure to advance evidence that he had a qualified perceived disability because Moroni Feed believed he had an illegal drug addiction severe enough to substantially limit the major life activity of working, Nielsen also failed to advance evidence that Moroni Feed fired him on the basis of any perceived disability or conduct attributed to it. On this ground summary judgment also was proper. While, as noted, Nielsen did present evidence that some at Moroni Feed at some point believed he was addicted to prescription painkillers, the record is clear that Nielsen was ultimately discharged, not because

- 21 -

of an erroneous perception that he was addicted to prescription painkillers, but because of his underlined unexplained conduct in entering uninvited into the homes of co-workers and co-op participants in the small community where Moroni Feed was located.

It is undisputed that for a considerable time Moroni Feed tried to work with Nielsen after receiving information that caused some of Moroni Feed's directors to believe he was addicted to painkillers. The co-op also directed him to a drug treatment center for evaluation. During none of this time was he discharged. It was only after the evaluation came back from Dayspring that he was not addicted to drugs and thus that his bizarre conduct of going into homes throughout the community uninvited could not be explained by drug addiction that Nielsen was terminated. The timing of Nielsen's discharge, and the references in the record about the deliberation of the Board, as well as the reasons articulated to Nielsen himself for the discharge, all make it clear beyond peradventure that Nielsen was discharged for his conduct, and that this conduct, at the time of his discharge, was not erroneously attributed to illegal drug use. Simply put, Nielsen's conduct was potentially quite disruptive to Moroni Feed, and when it was neither stopped nor explained, Moroni Feed determined it could no longer trust or tolerate a president who engaged in such conduct. Therefore, because Nielsen has failed to produce any evidence that Moroni Feed fired him on the basis of an erroneously perceived

disability based on illegal drug use or conduct believed to be so caused, the district court properly granted Moroni Feed's summary judgment motion. Cf. 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual . . . .") (emphasis added); Maddox, 62 F.3d at 848-49 (affirming summary judgment dismissing college football coach's ADA and Rehabilitation Act claims after finding coach's criminal conduct and bad publicity surrounding it was "sufficient to motivate the discharge," because "[i]t is obvious that . . . [the coach] would be representing not only the team but the university.").

## CONCLUSION

The judgment of the district court is AFFIRMED.