**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 27, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MICHAEL BURRIS,

       Plaintiff-Appellant,

v.

NOVARTIS ANIMAL HEALTH U.S., INC.,

       Defendant-Appellee.

No. 08-6030
(D.C. No. 5:06-CV-01058-C)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **PORFILIO**, and **TYMKOVICH**, Circuit Judges.

Michael Burris appeals the district court's grant of summary judgment to

defendant Novartis Animal Health U.S., Inc., on his claims that Novartis violated

the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213,

and the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, when it

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

disciplined him and eventually terminated his employment as a territory manager for sales (TM) for the company. The district court held that Mr. Burris had made his prima facie case of FMLA retaliation, but had failed to show sufficiently that Novartis' proffered non-discriminatory reason for these actions–poor performance–was pretextual. The district court also granted summary judgment to Novartis on Mr. Burris's ADA claim on the same ground and then denied Mr. Burris's motion seeking relief under Federal Rule of Civil Procedure 60(b) on the basis of newly discovered evidence.

We agree with Mr. Burris that he presented sufficient evidence to survive summary judgment on his FMLA claim, but agree with Novartis that summary judgment on the ADA claim should be affirmed on an alternate ground. Therefore, exercising our jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I.

"We review the grant of a summary judgment motion de novo." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222 (10th Cir. 2008). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Fye*, 516 F.3d at 1223.

Mr. Burris was hired by Novartis as a TM in June 1999. He worked selling Novartis animal health medications to veterinarians. Among the medications Mr. Burris sold were Sentinel and Interceptor to control parasites, Deramaxx and Adequan for arthritis pain, and Atopica for dermatitis.

Novartis evaluates its employees' performance twice a year. The annual performance review rates each employee with a two-part score. The first part rates the employee's level of achievement as to sales goals (Sales Goals). *See, e.g.,* Aplt. App., Vol. I at 283. The second part is more subjective, rating the employee on his or her "Shared Values and Related Behaviors" such as leadership, communication, commitment/self-discipline, and others (Behavior Goals). *See, e.g., id*. at 285. As to each part of the score, the employee is assigned a number between one and three, with the employee being assigned a "3" if the employee exceeds expectations, a "2" if he or she meets expectations, and a "1" if the employee partially met or did not meet expectations. *See* Aplt. App., Vol. I at 283, 285, 289. The more general mid-year performance review does not assign a numerical score.

Viewed in the light most favorable to Mr. Burris, the reviews from 1999 through 2002 show that he was rated a strong and steady performer who was probably stronger in regard to the Sales Goals than the Behavior Goals. They do not show any serious deficiencies in either area. In 2003, Mr. Burris had a poor sales year. He was ranked as "partially" meeting expectations at his mid-year

review, the lowest possible ranking, *id*. at 299, and received a 1.2 on his year-end review, meaning he fully met his Behavior Goals, but only partially met his Sales Goals, *id*. at 367. Although 2003 was Mr. Burris's worst year, 2004 turned out to be his best. Mr. Clary ranked him as exceeding expectations on all but three of the mid-year goals and fully meeting expectations for those three. He stated "[w]hat a difference a year makes–right?" and that he was "very pleased with [Mr. Burris's] contributions to the overall success of the district." *Id*. at 360. Mr. Burris was ranked number two in sales in the district to that point. His overall rating was exceeds expectations, which was the highest possible rating.

In December 2004, Casey Berley took over as district manager of Mr. Burris's sales district. Nevertheless, Mr. Clary completed Mr. Burris's year-end review, giving him a 3.2 rating, meaning he fully met expectations for his Behavior Goals and exceeded expectations for his Sales Goals. *Id*. at 112. Mr. Clary stated that this was quite an improvement from the previous year but that his sales dropped off a bit at the end of the year. He further stated:

> Even though you did deliver sales results over expectations[,] your inability to meet admin[inistrative] deadlines cost you in [your Behavior Goals]. For someone that wants to become a [district manager], you must do a better job in rounding out your total performance. The job is more than just selling product.

*Id*. An examination of the overall total sales numbers for the TMs under Mr. Clary, shows that as of December 30, 2004, Mr. Burris ranked third out of

seven in percentage of yearly goal achieved, with 113.46% achieved. Aplt. App., Vol. I at 307. The net sales figures also have Mr. Burris ranked third. *Id*. at 308.

But, it is the period from the beginning of 2005 that is most at issue in this case. In February 2005, Mr. Berely worked with Mr. Burris and subsequently critiqued his performance. In April 2005, Mr. Burris notified Mr. Berely that he was an alcoholic and entered an inpatient treatment program on April 22. He was in the in-patient treatment program for about a month and then attended an out-patient program upon his release. He returned to work at the beginning of June 2005, and on June 15, 2005, he met with Mr. Berely and was presented with a document entitled "Discussion Points and 30 Day Objectives for Mike Burris" (30-Day Objectives) which assigned him a number of requirements to meet in approximately the next month. *Id*. at 179. Shortly thereafter, he received his 2005 mid-year performance review, where he received the lowest possible ranking–that he "Partially Met" expectations. *Id*. at 348. On August 11, 2005, Mr. Berely and a human resources department representative from Novartis presented Mr. Burris with a "Performance Improvement Plan" (PIP) which was to serve as his "Final Written Warning" and which contained a number of fairly onerous sales and administrative requirements. *Id*. at 181-83.

On August 26, 2005, Mr. Burris sent an e-mail to Mr. Berely updating him on his progress in regard to the PIP and acknowledging that he had fallen short of

the goals set forth on the PIP. *Id*. at 195. He was fired a week and a half later. We shall discuss all of these actions in more detail below.

II.

Mr. Burris argues that when he returned to work, Mr. Berely retaliated against him for taking FMLA leave in violation of 29 U.S.C. § 2615(a)(2). "Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations omitted). "To make out a prima facie [FMLA] retaliation claim, [an employee] must show that: (1) [he] engaged in a protected activity; (2) [his employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (quotation omitted). Here the district court found that Mr. Burris had made out his prima facie FMLA retaliation case.

The burden then shifted to Novartis to offer a legitimate, non-retaliatory reason for the adverse employment action. *Metzler*, 464 F.3d at 1170. It argued it fired Mr. Burris for poor performance. Mr. Burris then had to demonstrate that there was a genuine dispute of material fact as to whether Novartis's proffered non-discriminatory reason was pretextual. *Id*. at 1172. "To raise a fact issue of pretext, [Mr. Burris] must . . . present evidence of temporal proximity plus

-6-

circumstantial evidence of retaliatory motive." *Id*. "A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005) (quotation omitted), *overruled on other grounds by Metzler*, 464 F.3d 1171 n.2. Evidence of pretext may include, but is not limited to, prior treatment of the plaintiff, disturbing procedural irregularities, and the use of subjective criteria. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999); *see also Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008) ("[P]retext can be shown in any number of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities.") (quotation omitted); *Rivera v. City and County of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.") (quotation omitted).

But, while "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment[,]" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted), a plaintiff need not demonstrate that discriminatory reasons motivated the employer's actions to avoid summary judgment, *id*. at 1321-22.

The plaintiff need only make out his prima facie case and present evidence sufficient for a reasonable jury to find that the employer's proffered non-discriminatory reason was unworthy of belief. *Id.* at 1321; *Randle v. City of Aurora*, 69 F.3d 441, 451-52 (10th Cir. 1995).

Here, the district court also held that Mr. Burris had failed to show that the other TMs who were not given 30-Day Objectives or placed on a PIP were similarly situated to him. It held that he had "fail[ed] to address whether the other employees had the long history [Mr. Burris] had of subpar performance in various areas." *Id.*, Vol. II. at 498.

We determine the district court erred in holding that no reasonable jury could have found Novartis's "poor performance" explanation unworthy of belief. *Metzler*, 464 F.3d at 1172. The district court held that Mr. Burris's "arguments [did] not create a jury question on the issue of the criteria employed by the PIP." Aplt. App., Vol. II at 497. We understand this to mean that the district court summarily held that no reasonable jury could determine that the issuance of that PIP, with those requirements, or the disciplinary actions prior to that issuance, could constitute FMLA retaliation. The court then went on to state that, therefore, "[t]he relevant inquiry is not whether or not Plaintiff's performance merited a PIP or whether or not his failure to meet the requirements of PIP required termination, but whether Defendant reasonably believed its actions were correct." *Id.* at 498.

It appears that after determining that disciplinary actions up to and including the issuance of the PIP could not be reasonably considered retaliatory, the district court then concluded that the subsequent termination could also not be retaliatory because Mr. Burris acknowledged that he had "fallen short on the goals set forth" in the PIP. *Id*., Vol. I at 195. We believe this analysis is flawed. Considering Mr. Burris's performance record, a reasonable jury could determine that the 30-Day Objectives, the poor mid-year performance review, and the onerous PIP were all part of a retaliatory course of action designed to drive Mr. Burris from the company following his return from leave.

We look first at Mr. Burris' sales performance prior to his leave. As noted previously, in the middle of February 2005, Mr. Berely spent a day with Mr. Burris in the field, and then critiqued his performance by e-mail on February 21, 2005. Mr. Berely stated that Mr. Burris had a "good rapport, and solid business relationships with the clinics" that were visited, and made a number of other positive comments. *Id*. at 185. But Mr. Berely was critical of Mr. Burris's communication both with him and Mr. Burris's teammates, Mr. Burris's willingness to lead by example and use his experiences to the benefit of the district, and his performance as the district's "Atopica Product Champion." *Id*. He noted that Mr. Burris's performance was "well below the district average" in that had closed only two Atopica Challenges. *Id*. He stated that Mr. Burris need to concentrate on "[c]alling ahead to make appointments, better attention to

follow up, and more overall effort," and that he could not recommend that Mr. Burris be promoted to the position of Senior TM. *Id.*

Nevertheless, although Mr. Berely commented that Mr. Burris had closed only two Atopica Challenges at the time of the February critique, the sales numbers from March 24, 2005, show that by that time there were two TMs who had worse sales numbers than Mr. Burris in the "Derm" category, *id.* at 375, which was evidently made up of Atopica sales, *id.* at 373. Further, Mr. Burris' 2005 mid-year review stated "[y]ou achieved our base goal for Atopica challenges during the AC1 period," *id.* at 346. The numbers also show that at that point Mr. Burris ranked second in the district in total sales–apparently excluding two drugs, Adequan and Ethicon–versus yearly goal, having met 28.52% of his yearly goal at that point. *Id.* at 375.

As to Mr. Burris's performance regarding Behavior Goals prior to leave, although the annual reviews show that his Behavior Goals scores tended to lag behind those on his Sales Goals, especially regarding his commitment to the administrative portion of the job, he nevertheless received a rating of "2" every year, meaning he fully met the performance expectations. He clearly had delinquencies with his Corporate American Express Card,[1] but the record also

---

[1]    On January 28, 2005, a Novartis employee contacted Mr. Berely by e-mail, informed him that Mr. Burris's Corporate American Express account had an $88.41 balance that was seventy-three days past due, and asked that despite the "nominal" amount, Mr. Burris be talked to because "he ha[d] a history of past

(continued...)

shows that others fell behind paying their American Express accounts at times. And while the February critique listed a number of areas in need of improvement, it also listed a number of areas where Mr. Burris's performance was good, and it is fair to infer that an e-mail informing Mr. Burris he would not be promoted to Senior TM would emphasize the negative aspects of his performance.

But two weeks after Mr. Burris returned from FMLA leave, the reviews became decidedly more critical, with Mr. Berely almost immediately presenting Mr. Burris with the 30-Day Objectives. These objectives concentrated *not on Behavior Goals but on Sales Goals*, despite the fact that Mr. Berely admitted that he made no adjustment to Mr. Burris's sales targets despite his being out of the field on medical leave for over a month.

Novartis suggests that Mr. Burris was already behind his sales goals before he went on leave. But the only evidence it points to as support for that proposition is testimony of another TM who made sales calls in Mr. Burris's territory while Mr. Burris was on leave who asserted that, at the time he began making calls, Mr. Burris's sales numbers "were lacking." *Id*. at 134. As noted above however, as of March 24, 2005, Mr. Burris's was ranked number two in the percentage of his yearly goal that he had already accomplished. *Id*. at 375. Although Novartis notes that Mr. Burris got credit for any sales made by that

---

[1](...continued)
delinquencies." *Id*. at 121.

manager, and also that outside sales representatives selling Novartis products were also directed to pay special attention to Mr. Burris's territory, the covering TM testified that he only spent two to three days a week in Mr. Burris's territory and, while he testified he made a number of sales during that time, no specifics were offered. A reasonable inference in Mr. Burris's favor would be that his sales numbers would have suffered from his absence.

The 30-Day Objectives included performing an average of five sales calls a day, gaining ten new Deramaxx penetrations, ten new Adequan penetrations, and five new Atopica Challenges. But the record appears to show that Mr. Burris's *beginning-of-the-year* goal for the first seven or eight months was only five new Deramaxx penetrations, ten new Adequan penetrations, and ten new Atopica Challenges. *Id.* at 309. He was also required to detail and enroll eight clinics into a "Growing Up With Pets Promotion," perform four in-clinic seminars regarding that promotion, place drug samples in at least ten different accounts, and report his progress to Mr. Berely at least once a week. Further, Mr. Berely was clearly contemplating additional potential disciplinary action at that time. A handwritten note at the bottom of this document, evidently written by Mr. Berely, states "I told Mike that if the objectives were not accomplished by July 20, 2005, we would have to move to a very formal process that was very specific and time sensitive." *Id.* (all capitalization omitted).

Mr. Burris was then given the lowest ranking on his 2005 mid-year review. The review stated that "[a]s of June 23, 2005, you are at 83.3% of your YTD Net Sales Goal, and 41.1% of your YE Net Goal." *Id*. at 346. It also stated that

> [p]resently, your Sentinel penetration is 41.79%, Interceptor penetration is 78.98%, Deramaxx penetration is 60.29%, Adequan is 15.44%, and Atopica penetration is 33.82%. Your product penetrations have increased since year end 2004. You rank at the top of the district in Interceptor penetration, and are above average in Deramaxx penetration. Your challenge for the remainder of the year is to continue increasing your Sentinel, Deramaxx, Adequan and Atopica penetration. Our penetration goal for Deramaxx is 70%.

*Id*. at 346. The review stated that Mr. Burris's "progress towards [his] YTD goal and [his] Year End Goal [were] well below the district average." *Id*. at 347. But, again, no consideration was given to the fact that Mr. Burris was only in the field for a little under five of the first six months of 2005.[2]

The review also made the somewhat subjective judgment that: "[t]o this point in the year, you have unfairly pre-judged all major marketing initiatives for 2005 and have not implemented them. You are expected to implement all marketing initiatives in your territory." *Id*. It also said that he was "consistently past due with [his] Corporate American Express Card payments." *Id*. But, again, the record shows that he was not the only TM who did not always pay his American Express bill on time. The review also reminded Mr. Burris that he was to update Mr. Berely on his progress on a weekly basis and that he was expected

---

[2]    Perhaps not coincidently, at 83.3% as of June 23, 2005, Mr. Burris had attained 5/6 of his YTD Net Sales Goal.

"to better communicate with our district team members to share strategy, answer their inquiries of you, etc." *Id*.

As for the PIP, it claimed that Mr. Burris had "demonstrated a consistent lack of communication" with Mr. Berely and his teammates on various issues, that he had demonstrated a "consistent lack of execution of marketing programs . . . and account growth opportunities" and that he had shown "[c]onsistent disregard for sales goals common to the company, region, district, and territory." *Id*. at 181. The PIP then (1) referenced Mr. Berely's February 20, 2005, e-mail to Mr. Burris regarding the day he spent working with him; (2) asserted that Mr. Berely was the only team member that failed to consistently report the total number of Atopica Challenges closed each week before a weekly 5:00 p.m. Friday deadline Mr. Berely had imposed on March 25, 2005; (3) asserted that Mr. Burris had another late payment of his American Express Bill as of May 24, 2005, that had still not been resolved on June 6, 2005; and (4) referenced the 30-Day Objectives laid out on June 15, 2005, and the fact that many of them had not been achieved as of the date of the PIP. *Id*. at 181-82.

The PIP also contains performance requirements that a reasonable jury could conclude were designed to ensure failure. First, the PIP's reporting and other administrative requirements were onerous, and not specifically defended on the grounds that Mr. Burris had a drinking problem. For example, it required him

to immediately improve his communications with Mr. Berely and his teammates "in all areas," *id*., and to:

> [e-]mail [to Mr. Berely] by 9:00 P.M[.], each night, a re-cap of daily activities, progress towards each goal listed above, the clinics you saw, the representative name from each clinic that you talked with, the phone number of the clinic and the approximate time that you visited them. If you received an order at those clinics called upon, I need the amount of the order, as well as the products ordered. Also on this email, I want to see the plan of scheduled activities for the following day, including clinic name, contact, approximate time of call and objectives (Monday itinerary is due by 9:00 P[.]M. Sunday). I reserve the right to call and/or visit any of these clinics at any time to follow up on your appointment.
>
> Give printed itineraries at the beginning of all ride withs (this includes all field colleagues and all office personnel), with an email copy forwarded to me two days prior to ride withs. This itinerary should list the start time of the day and the expected end time.

*Id*. at 182-83 (emphasis omitted).

Mr. Burris testified that the sales requirements were also unrealistic. The PIP required him to achieve four Deramaxx, five Atopica, and five Adequan penetrations *per week*, achieving eight Deramaxx, ten Atopica, and ten Adequan penetrations prior to August 31, 2005. *Id*. Mr. Burris testified:

> [If] [y]ou look at my new Deramaxx penetrations and if you compare them to what the actual penetrations are within each territory, mine says five through the month of July and August, but, the, in the performance improvement plan, he wants to add an additional four per week.
>
> So that would be 20 in the month of August, and that would be more than 70 percent of my client base, which would be over the national goal.

*Id*. at 253.

Mr. Burris was referring to the sales figures from two days prior to the PIP. Those figures show that as of August 9, 2005, Mr. Berely was number six out of seven TMs in the percentage of his year-to-date sales goal achieved with 82.90%. *Id*. at 376. But only one of the seven had at that point achieved more than 87%. *Id*. He was last in the percentage of sales goal achieved for the first half of the year (January-June) at 88.59%, and he was fifth in the percentage of his year-end goal achieved to that point with 51.79%. *Id*.

But broken down even further, Mr. Burris was third in the percentage of his parasiticides (Sentinel and Interceptor) year-end goal achieved to that point; second in the percentage of his pain (Deramaxx and Adequan) year-end goal achieved to that point, fourth in the percentage of his Atopica year-end goal achieved to that point; and fifth, third, and third in three other categories. *Id*. at 373. The TM who at that point in the year was last overall in the percentage of year-end goal achieved, trailed Mr. Burris in every drug category. *Id*. at 373, 376.

And looking just at the first nine days of August, Mr. Burris was first in the percentage achieved of that month's goal. *Id*. at 372. He was also first in Deramaxx orders obtained between July 15, 2002, and August 9, 2002, with 5. *Id*. at 378. Of the other TMs in the district, one had three orders for that time period and the others had one order each. *Id*.

From the above, a reasonable jury could conclude that Mr. Burris was treated differently than his similarly situated teammates in that (1) until he took FMLA leave, Mr. Burris's performance was comparable or better than a number of his teammates, (2) his leave adversely affected his sales numbers, and (3) those weak numbers were used, along with his administrative weaknesses, to subject him to increasingly unrealistic job requirements eventually leading to his termination..

Finally, while there was testimony from some of the Mr. Burris's co-workers that he was a poor and unresponsive teammate, there was other evidence that disputes that characterization. For example, one of the TMs claimed that when he was hired Mr. Burris was supposed to be his mentor, but that he did such a poor job the new TM eventually went into the field on his own. But, although that TM testified he complained to Mr. Clary about Mr. Burris's efforts, Mr. Clary praised Mr. Burris in his annual review for mentoring that TM "into [Novartis] seamlessly." Aplt. App., Vol. I at 360. Another example is that one of the TMs averred that Mr. Burris had a "great work ethic and was a good performer"; that she "learned a lot from Mr. Burris"; and that she "was shocked both professionally and personally when Mr. Burris was terminated." *Id*. at 382.

In short, a genuine issue of material fact regarding Mr. Burris's poor performance was presented. Viewing the above in the light most favorable to Mr. Burris, a reasonable jury could determine that Mr. Burris was treated

-17-

differently than his similarly situated teammates; that his performance was not the reason that he was given 30-Day Objectives, received a poor mid-year 2005 review, was put on a PIP, and eventually terminated; and that Novartis's proffered non-discriminatory reason for these actions was therefore pretextual.[3]

IV.

The district court also granted summary judgment to Novartis on Mr. Burris's ADA claim on the ground that he could not show that Novartis's proffered non-discriminatory reason was pretextual. Our reasoning above applies with equal force to that ruling. Novartis, however, also argues that there is an alternative reason for affirming the district court's ruling on the ADA claim. Novartis argues that Mr. Burris did not present sufficient evidence on summary judgment to show that he would be able to prove his prima facie discrimination case under the ADA. We agree.

To make out a prima facie case of discrimination under the ADA, a plaintiff must prove that he is a disabled person under the ADA, that he was qualified for the job that he held, with or without reasonable accommodation, and that he was discriminated against because of his disability. *Jones v. UPS, Inc.*, 502 F.3d 1176, 1189 (10th Cir. 2007). Novartis argued on summary judgment

---

[3] Because we are remanding Mr. Burris's FMLA retaliation claim to the district court for further proceedings, we need not address his claim that the district court erred in denying his Rule 60(b) motion seeking to present more evidence of pretext.

that he could not show that he had a disability.  The ADA defines the term

disability as a (1) "physical or mental impairment that substantially limits one or

more of the major life activities of such individual," (2) "a record of such an

impairment," or (3) "being regarded as having such an impairment."  42 U.S.C.

§ 12102(2).  Novartis argues that Mr. Burris cannot show that his alcoholism

substantially limits one or mor of his major life activities.

"Major life activities include such functions as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,

sleeping, sitting, standing, lifting, reaching, and working."  *Rakity v. Dillon*

*Companies, Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002) (quotation omitted).

> For a physical or mental impairment to be "substantially limiting"
> the individual must be:  "(i) Unable to perform a major life activity
> that the average person in the general population can perform; or (ii)
> Significantly restricted as to the condition, manner or duration under
> which [the] individual can perform a particular major life activity as
> compared to the condition, manner, or duration under which the
> average person in the general population can perform that same
> major life activity."

*Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 611 n.11 (10th Cir. 1998) (quoting

29 C.F.R. § 1630.2(j)(1)) (brackets in original).

"We have held that alcoholism is a disability under the Rehabilitation Act.

We have also observed in dicta that the status of being an alcoholic may merit

protection under the ADA."  *Renaud v. Wy. Dep't of Fam. Servs.*, 203 F.3d 723,

729-30 (10th Cir. 2000) (citations and footnote omitted).  We have implicitly held

that drug addiction is not per se a disability, but that the addiction must substantially limit one or more of the major life activities. *Nielsen*, 162 F.3d at 609-10. We see no reason that the same should not be true of alcoholism. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997).

In support of its argument that Mr. Burris could not show that his alcoholism substantially limited one or more of his major life activities, Novartis pointed to Mr. Burris's testimony that his alcoholism did not necessarily have anything to do with a peak or valley in his sales numbers, that it did not impair his ability to go to work or complete administrative paperwork, and that he could perform his job functions before he decided to seek treatment and was successful as a salesman before he sought treatment.

On appeal, Mr. Burris argues that he presented evidence that created a jury issue as to the question of whether his alcoholism substantially limited one of his major life activities claiming:

> Alcoholism is a disease that has affected Burris both physically and mentally. Burris has the brain of a chronic alcoholic, which affects his thought processes, reactions to events, and social interactions. Alcoholism has affected Burris physically due to an allergy he has that is associated with the consumption of alcohol. The disease of alcoholism limits Burris' ability to take care of himself on a daily basis. Burris must exclude himself from daily situations that are healthy for a non-alcoholic but which could . . . lead Burris to drink alcohol. . . . Burris presented evidence that some of his major life activities–mental process, social interaction, his ability to care for himself on a daily basis–are substantially limited by his alcoholism.

Aplt. Reply Br. at 11-12.[4]

But a review of the record shows that while Mr. Burris testified that his alcoholism "[a]bsolutely" limited his ability to take care of himself on a daily basis, when pressed for specifics he testified in a very general manner that as an alcoholic he could not drink, that he had to attend AA meetings, and that he had to be careful not to put himself in situations that might trigger a relapse. Aplt. App., Vol. I at 243. When asked if his alcoholism limited his ability to dress himself he answered generally that he could not do a lot of things that non-alcoholics took for granted because his thought process was different than a non-alcoholic's. When he was asked if his alcoholism limited his ability to walk, he testified that he had to be careful not to "walk" into a situation where he "could get upset." *Id.* When he was asked if his alcoholism limited his ability to see, he generally testified that he "sees" things differently than non-alcoholics, giving as an example the sight of a person drinking in a bar. *Id.* But he testified that as long as he continued with his AA meetings he could function "somewhat normally" at work and as a father, again with the caveat of having to avoid certain types of situations.

---

[4] Mr. Burris also argues that he is disabled in that he has a record of alcoholism and is regarded as having alcoholism under 42 U.S.C. § 12102(2)(B) & (C). But those subsections refer to persons who have a record of, or are regard as having, "such an impairment," with that impairment being one that "substantially limits one or more of the major life activities." Thus, considering the evidence presented on summary judgment in this case, our reasoning below applies to these subsections as well.

-21-

These are not examples of substantial limitations of Mr. Burris's major life activities. In essence, he testified that when he was drinking his job performance did not suffer greatly, and now that he has stopped drinking he has to be careful not to drink again. But he presented little specifics as to the adverse effects his drinking had on his life prior to treatment and how his disease and treatment actually affect his ability to function. Consequently, we agree the district court's grant of summary judgment on Mr. Burris's ADA claim should be affirmed.

V.

The judgment of the district court on Mr. Burris's ADA claim is AFFIRMED. The judgment of the district court on Mr. Burris's FMLA claim is REVERSED, and the matter is REMANDED to the district court for further proceedings.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge